UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MARK S. BROWN,

                          Plaintiff,

v.                                                                    5:15-CV-1506
                                                                      (GTS)
COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
_____

APPEARANCES:                                          OF COUNSEL:

IACONIS LAW FIRM                                     PAUL F. IACONIS, ESQ.
  Counsel for Plaintiff
501 Genesee Street
Chittenango, NY 13037

U.S. SOCIAL SECURITY ADMIN.                  LAUREN E. MYERS, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II     Special Assistant U.S. Attorney
  Counsel for Defendant
26 Federal Plaza, Room 3904
New York, NY 10278

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this Social Security action filed by Mark S. Brown

("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner")

pursuant to 42 U.S.C. § 405(g), are Plaintiff's motion for judgment on the pleadings and

Defendant's motion for judgment on the pleadings.  (Dkt. No. 28, 32.)  For the reasons set forth

below, Plaintiff's motion for judgment on the pleadings is denied and Defendant's motion for

judgment on the pleadings is granted.  The Commissioner's decision denying Plaintiff's

disability benefits is affirmed, and Plaintiff's Complaint is dismissed.

## I.  RELEVANT BACKGROUND

### A.  Factual Background

Plaintiff was born in 1964, making him 46 years old at the alleged onset date and 50 years old at the date of the final agency decision.  Plaintiff has a ninth or tenth grade education (both of which constitute a limited education under the applicable regulations), and past work as a flagger, forklift operator, and machine operator for a wire manufacturer.  Plaintiff was insured for disability benefits under Title II until December 31, 2013.  Generally, Plaintiff alleges disability consisting of lower back problems, neck problems, and depression.

### B.  Procedural History

Plaintiff applied for Title II Disability Insurance Benefits on July 8, 2010.  Plaintiff alleged disability beginning November 19, 2009.  Plaintiff's application was initially denied on September 14, 2010, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  Plaintiff appeared at an initial hearing before ALJ Elizabeth W. Koennecke on November 15, 2011, as well as at subsequent hearings on January 26, 2012, and April 30, 2012.  On May 16, 2012, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act.  (T. 195-211.)  On April 3, 2013, the Appeals Council remanded for further consideration of the opinion evidence, Plaintiff's mental impairments, the residual functional capacity, and whether there was any other work in the national economy that Plaintiff remained able to perform.  (T. 212-15.)  Plaintiff amended his alleged onset date to June 14, 2010, and appeared at hearings before the ALJ on September 25, 2013, and December 19, 2013.  On March 27, 2014, the ALJ again issued an unfavorable written decision finding Plaintiff not disabled under the Social Security Act.  (T. 18-49.)  On October 22, 2015, the Appeals Council denied

Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (T. 1-4.)

### C. The ALJ's Decision

Generally, in her decision, the ALJ made the following six findings of fact and conclusions of law. (T. 13-21.) First, the ALJ found that Plaintiff has not engaged in substantial gainful activity since June 14, 2010, the amended alleged onset date. (T. 22.) Second, the ALJ found that Plaintiff's mild degenerative disc disease of the lumbar and cervical spine, mood disorder, and substance-use disorder are severe impairments, while his hypertension, hyperlipidemia, chronic obstructive pulmonary disease, gastroesophageal reflux disease, overactive bladder, obesity, traumatic brain injury, headaches, and visual disturbances are not severe impairments. (T. 22-23.) Third, the ALJ found that Plaintiff's severe impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"). (T. 26.) More specifically, the ALJ considered Listing 1.04 (spinal impairments), 11.00 (neurological impairments), 14.09 (inflammatory arthritis), 12.02 (cognitive impairments), 12.04 (mood disorders), 12.05 (intellectual disorders), 12.06 (anxiety-related disorders), and 12.09 (substance addiction disorders). (T. 26-29.) Fourth, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

> light work as defined in 20 C.F.R. 404.1567(b), except that the claimant could lift, carry, push, or pull up to 25 pounds occasionally and 10 pounds frequently; could occasionally bend at the waist; and could alternate between sitting and standing throughout the workday, but was otherwise capable of standing or walking, in combination, for 6 hours total in an 8-hour workday, and sitting for 6 hours total in an 8-hour workday. Additionally, the claimant retained the ability to understand and follow simple instructions and directions; perform simple tasks with supervision and independently; maintain attention and concentration for simple tasks; regularly attend to a routine and maintain a schedule; relate to

3

and interact appropriately with others to the extent necessary to carry out simple tasks; handle reasonable levels of simple, repetitive work-related stress in that he can make occasional decisions directly related to the performance of simple tasks in a position with consistent job duties that does not require the claimant to supervise or manage the work of others; and required rare contact with the general public.

(T. 29.)  Fifth, the ALJ found that Plaintiff is unable to perform his past work based on the restrictions in the RFC.  (T. 46.)  Sixth, and finally, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including housekeeping cleaner, automatic car-wash attendant, and coin-machine collector.  (T. 47-48.)

### D.  The Parties' Briefings on Their Cross-Motions

Generally, Plaintiff asserts five arguments in support of his motion for judgment on the pleadings.  First, Plaintiff argues that the ALJ relied on selective evidence showing lesser impairment while ignoring other evidence that showed greater impairment.  (Dkt. No. 28, at 19-20 [Pl. Mem. of Law].)  Second, Plaintiff argues that the ALJ committed error in failing to find that his traumatic brain injury and left knee impairment were severe impairments.  (Dkt. No. 28, at 20-22 [Pl. Mem. of Law].)  Relatedly, Plaintiff also argues that the ALJ failed to include limitations resulting from these impairments in the RFC.  (Dkt. No. 28, at 22-23 [Pl. Mem. of Law].)  Third, Plaintiff argues that the ALJ arbitrarily substituted her own lay opinion for those of Plaintiff's medical practitioners.  (Dkt. No. 28, at 23-31 [Pl. Mem. of Law].)  Similarly, Plaintiff argues that the ALJ erred in the weight she afforded to the treating and examining sources, including the opinions from Nurse Practitioner Behling, Dr. Martin, and Dr. Finger. (Dkt. No. 28, at 31-34 [Pl. Mem. of Law].)  Plaintiff also argues that the ALJ erred in her explanation for the weight afforded to the opinion of the non-examining State Agency psychological consultant.  (Dkt. No. 28, at 34 [Pl. Mem. of Law].)  Fourth, Plaintiff argues that

the ALJ erred in applying the appropriate factors for assessing Plaintiff's credibility. (Dkt. No. 28, at 34-39 [Pl. Mem. of Law].) Fifth, and last, Plaintiff argues that the ALJ failed to develop the record by failing to re-contact Plaintiff's treating physicians. (Dkt. No. 28, at 39- [Pl. Mem. of Law].)

Generally, Defendant asserts five arguments in support of her motion for judgment on the pleadings. First, in response to Plaintiff's second argument, Defendant argues that the ALJ correctly determined that Plaintiff's traumatic brain injury and knee impairment were not severe impairments, and asserting that, even though the ALJ found these impairments non-severe, she still considered all medically determinable impairments in her analysis of the RFC. (Dkt. No. 32, at 5-8 [Def. Mem. of Law].) Second, in response to Plaintiff's first and third arguments, Defendant argues that the RFC determination was supported by substantial evidence. (Dkt. No. 32, at 8-17 [Def. Mem. of Law].) More specifically, Defendant argues that the ALJ properly considered all the evidence in the record, appropriately weighed the opinion evidence, and formulated a decision based on the record as a whole. (*Id.*) Third, in response to Plaintiff's fourth argument, Defendant argues the ALJ's credibility determination was supported by substantial evidence, asserting that the ALJ properly relied on inconsistencies in Plaintiff's reports throughout the record, his course of treatment and medication compliance, and receipt of unemployment benefits during the period Plaintiff alleged he was disabled, as well as that the ALJ properly rejected the testimony of Plaintiff's family due to inconsistencies and a lack of corroboration with the record. (Dkt. No. 32, at 17-19 [Def. Mem. of Law].) Fourth, in response to Plaintiff's fifth argument, Defendant argues that the record was appropriately developed and there was no legal requirement to re-contact any medical source for clarification or further information. (Dkt. No. 32, at 19-20 [Def. Mem. of Law].) Fifth, and last, Defendant argues that

the ALJ's Step Five conclusion that there was a significant number of jobs Plaintiff could perform was supported by substantial evidence. (Dkt. No. 32, at 20-21 [Def. Mem. of Law].)

## II.     RELEVANT LEGAL STANDARD

### A.     Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. 42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

"Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts

6

from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### B.   Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act. 20 C.F.R. §§ 404.1520, 416.920. The Supreme Court has recognized the validity of this sequential evaluation process. *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982), *accord, McIntyre v. Colvin,* 758 F.3d 146,

150 (2d Cir. 2014). "If at any step a finding of disability or non-disability can be made, the SSA

will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III.    ANALYSIS

### A.    Whether the ALJ Improperly Ignored Evidence in the Record When Making Her Findings

After carefully considering the matter, the Court answers this question in the negative for

the reasons stated in Defendant's memorandum of law.  (Dkt. No. 32, at 8-10 [Def.'s Mem. of

Law].)  To those reasons, the Court adds the following analysis.

This Court has recognized that "the ALJ must consider all evidence in the record" and

"cannot ignore evidence supporting Plaintiff's claim while at the same time accepting evidence

that supports his decision." *Ryan v. Astrue*, 650 F.Supp.2d 207, 216 (N.D.N.Y. 2009) (citing

*Sutherland v. Barnhart*, 322 F.Supp.2d 282, 289 (E.D.N.Y. 2004); *Armstead ex. rel. Villanueva*

*v. Astrue*, No. 1:04-CV-0503, 2008 WL 4517813, at *18 (N.D.N.Y. Sept. 30, 2008)).  However,

"'an ALJ is not required to discuss in depth every piece of evidence contained in the record, so

long as the evidence of record permits the Court to glean the rationale of an ALJ's decision.'"

*Coleman v. Comm'r of Soc. Sec.*, No. 5:14-CV-1139, 2015 WL 9685548, at *5 (N.D.N.Y. Dec.

11, 2015) (Report and Recommendation), adopted by 2016 WL 109994 (N.D.N.Y. Jan. 8, 2016)

(quoting *LaRock ex. rel. M.K. v. Astrue*, No. 10-CV-1019, 2011 WL 1882292, at *7 (N.D.N.Y.

Apr. 29, 2011)).

In arguing that the ALJ improperly ignored evidence, Plaintiff points to a few instances

from the record that were contrary to the ALJ's findings, such as evidence purportedly

establishing that Dr. Finger's release to full duty work was in the context of his work as a flagger

(in which job Plaintiff reported lifting 10 pounds), that the ALJ ignored evidence that Plaintiff's work as a flagger was performed with "marked accommodations," that chiropractic and physical therapy treatments had been unsuccessful and examinations showed progression of Plaintiff's impairments after Dr. Finger opined he had reached maximum medical improvement, that Plaintiff's medications did not allow him to perform more than minimal activities such as short walks and minimal part-time work, and that some examinations showed abnormal physical findings. (Dkt. No. 28, at 19-20 [Pl. Mem. of Law].)

Plaintiff's argument that the ALJ improperly ignored evidence favorable to Plaintiff when formulating the RFC assessment is not availing for a number of reasons. First, the majority of Plaintiff's issues with the ALJ's discussion of the evidence relate to the alleged failure to consider that Plaintiff's work as a flagger had been (according to Plaintiff) significantly accommodated. Yet, Plaintiff reported leaving this job not because his impairments prevented him from continuing to do it, but rather that he was laid off when the company did not have enough work for him to do. (T. 35, 438.) Nor is there any evidence other than Plaintiff's testimony that showed this work was accommodated to such a significant degree that it would undermine the ALJ's findings. Additionally, although the ALJ did rely in part on opinions from treating physician Dr. Finger from as far back as 2005, Plaintiff is alleging he became disabled as of June 14, 2010. (T. 19, 168.) Whether Plaintiff's work as a flagger prior to that date was accommodated to any degree is of little importance to the issue of whether he was disabled between the alleged onset date of June 14, 2010, and the date last insured of December 31, 2013. Additionally, Plaintiff's inability to perform work as a flagger specifically would not necessitate a finding of disability so long as the ALJ could show there were other jobs Plaintiff remained

able to perform, something which the ALJ did in her Step Five finding. (T. 46-47.) *See also* 20 C.F.R. § 404.1520(a)(4)(v).

Second, the ALJ's written decision indicates that she did not engage in an improperly selective review of the evidence. The ALJ's 32-page decision contains detailed recitations and discussions of the evidence that indicate she assessed the whole record, whether or not she specifically highlighted the portions of the evidence that were more favorable to her findings. (T. 18-49.) As noted above, the ALJ is not required to discuss every piece of evidence before her. *Coleman*, 2015 WL 9685548, at *5; *see also Barringer v. Comm'r*, 358 F.Supp.2d 67, 78-79 (N.D.N.Y. 2005) (noting that an ALJ's failure to cite specific evidence does not mean it was not considered). The ALJ's discussion makes it apparent that, although she focused her discussion more heavily on the evidence that supported her findings, she did consider all the evidence before her and reconciled inconsistencies between different treatment notes when making her findings. *See Bliss v. Colvin*, No. 3:13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *White v. Colvin*, No. 6:13-CV-0084, 2014 WL 1311993, at *7 (N.D.N.Y. Mar. 31, 2014) ("[I]t is the ALJ's job to properly evaluate the evidence and reconcile any apparent inconsistencies."). Because this Court is able to glean the ALJ's rationale and the basis for her findings from the decision, the ALJ did not commit reversible error in failing to explicitly discuss the evidence Plaintiff points to in his brief.

For all these reasons, the ALJ did not improperly ignore evidence favorable to Plaintiff, and remand is not required on this basis.

**B.** **Whether the ALJ Erred at Step Two in Failing to Find Plaintiff's Traumatic Brain Injury and Knee Impairment to Be Severe Impairments**

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 32, at 5-8 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

At Step Two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that significantly limits his physical or mental abilities to do basic work activities. 20 C.F.R. § 404.1520(c). Basic work activities include walking, standing, sitting, lifting, carrying, pushing, pulling, reaching, handling, seeing, hearing, speaking, understanding, remembering and carrying out simple instructions, using judgment, and responding appropriately to supervision, co-workers and usual work situations. *Taylor v. Astrue*, 32 F.Supp.3d 253, 265 (N.D.N.Y. 2012) (citing *Gibbs v. Astrue*, No. 07-CV-10563, 2008 WL 2627714, at *16 (S.D.N.Y. July 2, 2008); 20 C.F.R. § 404.1521(b)(1)-(5)). "Although the Second Circuit has held that this step is limited to 'screening out *de minimis* claims' [], the 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition severe." *Taylor*, 32 F.Supp.3d at 265 (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995); *Colvin v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995)). Overall, the claimant retains the burden of presenting evidence to establish severity. *Taylor*, 32 F.Supp.3d at 265 (citing *Miller v. Comm'r of Soc. Sec.*, No. 7:05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008)).

This Court has also indicated that the failure to find a specific impairment severe at Step Two is harmless where the ALJ concludes there is at least one other severe impairment, the ALJ continues with the sequential evaluation, and the ALJ provides explanation showing he

adequately considered the evidence related to the impairment that is ultimately found non-severe. *Fuimo v. Colvin*, 948 F.Supp.2d 260, 269-70 (N.D.N.Y. 2013) (citing *Dillingham v. Astrue*, No. 09-CV-0236, 2010 WL 3909630 (N.D.N.Y. Aug. 24, 2010) (Report and Recommendation), adopted by 2010 WL 3893906 (N.D.N.Y. Sept. 30, 2010)); *see also Reices-Colon v. Astrue*, 523 F.App'x 796, 798 (2d Cir. 2013) (finding that any error in failing to find plaintiff's anxiety and panic disorder severe at Step Two would be harmless because the ALJ found other severe impairments present, continued through the sequential evaluation process, and specifically considered plaintiff's anxiety and panic attacks at those subsequent steps).

Plaintiff's arguments regarding his knee impairment are unavailing. The record does not contain evidence that Plaintiff sought treatment for this impairment on any sort of regular basis, nor do the treatment notes show a concrete diagnosis of a specific knee impairment or any evidence of functional limitations resulting from any such impairment. An x-ray of the knee taken on October 9, 2013, showed unremarkable osseous structure with no focal lesions or acute fracture, well-preserved joint spaces with no effusion, and normal soft tissues. (T. 1048.) The ALJ's finding that Plaintiff's reported knee symptoms did not constitute a medically determinable impairment, let alone a severe impairment causing functional limitations that would need to be accounted for in the RFC, is supported by substantial evidence.

Plaintiff's traumatic brain injury presents a more complex situation, because he did seek treatment for that impairment in 2012 and 2013. The record, however, contains conflicting evidence as to the severity of the functional limitations that this impairment imposed. Plaintiff reported experiencing significant deficits in memory and concentration as a result of his traumatic brain injury. (T. 104-05, 123, 175-76, 759, 1095-96, 1101, 1109.) However, treatment providers (including Nurse Practitioner Behling) generally noted fair or good attention and

concentration on examinations. (T. 760, 809, 1000, 998, 1002, 1004, 1006, 1055-56, 1058, 1060, 1064, 1066, 1068, 1072, 1074, 1076, 1078, 1081, 1083, 1085, 1087, 1089, 1170, 1176, 1178.) On other occasions, his memory was noted to be intact or otherwise not significantly impaired. (T. 760, 785, 790, 1101, 1110-11, 1121, 1170.) In fact, the notes from Plaintiff's regular mental health treatment as a whole indicate that, although Plaintiff continued to experience symptoms such as frustration, depressed mood, and abnormal affect, these symptoms (particularly his anger) had visibly improved with medication and he was fairly stable. (T. 785, 805-06, 809, 998, 1000, 1002, 1004, 1006, 1055-56, 1058, 1060, 1062, 1066, 1068, 1070, 1072, 1074, 1076, 1078, 1081, 1083, 1087, 1089, 1176, 1178.)

In addition, the results of examinations focusing more closely on Plaintiff's traumatic brain injury provide a mixed picture of Plaintiff's cognitive and mental functioning. A concussion management psychological evaluation with Dr. Spinks on August 29, 2012, did reveal symptoms including slow processing speed, variable attention, some impairment in his comprehension of questions, and memory deficits; however, while Dr. Spinks did indicate that the results of her evaluation were consistent with a traumatic brain injury of unknown severity, she noted that "depression can also cause several symptoms that overlap with TBI symptoms" and emphasized the importance of managing Plaintiff's depression. (T. 1096-97.) On September 24, 2012, Dr. Spinks noted that, although Plaintiff displayed a depressed mood and generally flat affect on examination, he "demonstrate[d] some logical thinking and good problem-solving abilities" during the session; she recommended a neuropsychological assessment and a consultation with a vocational rehabilitation counselor. (T. 1093-94.) On September 25, 2012, Occupational Therapist Harris observed that, although Plaintiff reported impaired memory and attention, he was able to remember two of three words after a delay and the third word when

13

given a prompt. (T. 1101.) On November 6, 2012, Dr. Ward observed a slightly depressed mood and a flat affect as well as that Plaintiff had scored 21/30 on the Mini Mental Status Examination with difficulties in language with repetition of sentences and abstraction and deficits in delayed recall and attention. (T. 1106-07.)

At a neuropsychological consultation on February 6, 2013, Dr. Bauer observed that Plaintiff was appropriate during the whole exam despite reporting easy agitation, though he did become too agitated to continue with the testing after completing 45 minutes. (T 1110-11.) Dr. Bauer noted that Plaintiff scored 30/30 on the Mini Mental Status Examination and that the results of the testing that was completed showed mildly impaired processing speed, mildly impaired memory for complex visual information, and moderately impaired visual planning and organization abilities; Dr. Bauer noted that Plaintiff did not complete the portions of the test assessing memory. (*Id.*) On March 11, 2013, Occupational Therapist Walter observed that Plaintiff had slow processing speed, though he was able to recall two of three words after a delay and the remaining word when given a prompt. (T. 1121.) At a neurological consultation on December 2, 2013, Dr. Shukri observed that Plaintiff was attentive and able to provide a well-organized medical history, had an intact fund of knowledge and no difficulty with complex instructions, and displayed intact recent and remote memory. (T. 1170.)

Although the evidence from when Plaintiff sought treatment in 2012 and 2013 showed that Plaintiff experienced some symptoms as a result of his traumatic brain injury, assertions that these symptoms would preclude work are undermined by the fact that Plaintiff's head injury occurred in 1997, after which time he continued to work making well above substantial gainful activity levels for most years between 1997 and 2009. (T. 412-13.) Plaintiff's ability to work for more than 10 years after his traumatic brain injury supports to some extent the ALJ's reliance on

14

notations that there was a question as to whether Plaintiff's cognitive symptoms were related to his traumatic brain injury or depression. (T. 24, 1096-97.)

The evidence related to Plaintiff's remote traumatic brain injury (recounted in detail above) suggests that this impairment may have caused some degree of limitations on Plaintiff's work-related functioning. However, even if those limitations were more than minimal, any failure by the ALJ to classify this impairment as a severe impairment at Step Two is harmless error in the context of this case. The ALJ properly considered all the evidence and formulated the RFC based on her assessment of that evidence and her resolution of the inconsistencies between various treatment notes, including the evidence of Plaintiff's traumatic brain injury. *Bliss*, 2015 WL 457643, at *7; *White*, 2014 WL 1311993, at *7. Most importantly, Plaintiff has not shown that the ALJ's resolution of the conflicting evidence related to this impairment was unreasonable, or that the mental limitations included in the RFC were not sufficient to account for the functional impact of Plaintiff's traumatic brain injury as shown by the treatment evidence as a whole. Consequently, because the ALJ considered the evidence related to Plaintiff's traumatic brain injury and accounted for the range of mental and cognitive impairment reasonably supported by the evidence in the record, any error to classify Plaintiff's traumatic brain injury as severe at Step Two was harmless and does not merit remand.

### C. Whether the RFC Assessment and the Weight Afforded to the Opinion Evidence Were Supported by Substantial Evidence

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 32, at 8-17 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R.

§ 404.1527(c). "'[T]he opinion of a claimant's treating physician as to the nature and severity of

the impairment is given 'controlling weight' so long as it is 'well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in the case record.'" *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015)

(quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)). However, there are situations

where the treating physician's opinion is not entitled to controlling weight, in which case the

ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the

opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'"

*Greek*, 802 F.3d at 375 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)). After

considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight

assigned to a treating physician's opinion.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d

at 129). "The failure to provide 'good reasons for not crediting the opinion of a claimant's

treating physician is a ground for remand.'" *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d

at 129-30). The factors for considering opinions from non-treating medical sources are the same

as those for assessing treating sources, with the consideration of whether the source examined

the claimant or not replacing the consideration of the treatment relationship between the source

and the claimant. *See* 20 C.F.R. § 404.1527(c)(1)-(6). Additionally, when weighing opinions

from sources who are not considered "medically acceptable sources"[1] under the regulations, the

---

[1] Medically acceptable sources are noted to include the following: licensed physicians; licensed or certified psychologists; licensed optometrists; licensed podiatrists; and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

ALJ must consider the same factors as used for evaluating opinions from medically acceptable sources. *Saxon v. Astrue*, 781 F.Supp.2d 92, 104 (2011) (citing *Canales v. Comm'r of Soc. Sec.*, 698 F.Supp.2d 335, 344 (E.D.N.Y. 2010)); SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006).

The ALJ justified her rejection of much of the opinion evidence based on finding that they were inconsistent with the severity of Plaintiff's impairments shown in the treatment notes. (T. 37-46.) This Court would like to point out that, although Plaintiff argues that the ALJ ignored evidence and failed to appropriately assess the evidence, that is not the case here and results from Plaintiff's own misinterpretation of the medical evidence. Regarding Plaintiff's assertions that the ALJ ignored evidence, such claims have already been addressed above in Part III.A of this Decision and Order. Regarding Plaintiff's assertions that the ALJ failed to properly assess the progression of Plaintiff's impairments over time when determining that the various opinions were inconsistent with the evidence, Plaintiff is mistaken. For example, Plaintiff indicates that Dr. Finger had "strongly urged [Plaintiff] to look for a job of lesser exertion" based on findings from an exam on February 26, 2009; however, review of this particular treatment note does not indicate that Dr. Finger made any such statement. (T. 741; Dkt. No. 28, at 25 [Pl. Mem. of Law].) Plaintiff also asserts that an MRI of Plaintiff's cervical spine "revealed marked degenerative changes" that were consistent with Dr. Finger's prognosis that Plaintiff's disability was "moderate partial and [] likely to become permanent and progressive." (Dkt. No. 28, at 26 [Pl. Mem. of Law].) However, review of the MRI study Plaintiff cites shows that this MRI actually showed no more than mild-to-moderate narrowing of the spinal canal and canal stenosis. (T. 814.) Plaintiff's misinterpretation of the medical evidence weakens his argument that the ALJ erred in finding that much of the opinion evidence inconsistent with the evidence in the record.

Given the significant volume of opinion evidence in this case and the fact that Plaintiff has both physical and mental impairments, matters related to the distinct assessment of the physical and mental RFC findings will be discussed separately below.

### 1. Physical RFC and Opinions

The ALJ afforded some weight to the opinion of the New York State Worker's Compensation Board that Plaintiff was 50 percent disabled related to injuries from July 2005, some weight to the "early-dated" opinions from treating physician Dr. Finger and Nurse Practitioner Jacobson, little weight to the "later" opinions from Dr. Finger, and little weight to the opinions from treating physician Dr. Martin. (T. 37-39.) These opinions will be discussed in turn below. The ALJ also afforded little weight to assessments from various sources related to Plaintiff's traumatic brain injury; however, these will be discussed in connection in relation to Plaintiff's mental RFC given that the majority of Plaintiff's complaints regarding that impairment involved mental and cognitive limitations. (T. 40-41.)

### a. Worker's Compensation Rating

Plaintiff argues that the ALJ erred in affording weight to a New York State Worker's Compensation Board decision that found Plaintiff had a permanent partial disability rating of 50 percent, asserting that this rating was only in relation to injuries suffered in July 2005 and there was no indication as to how such rating was determined. (Dkt. No. 28, at 20 [Pl. Mem. of Law].) However, the ALJ's explanations show that she did not rely heavily on this opinion. (T. 37.) The ALJ afforded this rating only "some weight," noting that such a determination was not binding due the fact that it used different standards for determining disability than the Social Security Administration applies and that the issue of disability is one reserved to the Commissioner. (*Id.*) The ALJ noted, however, that a 50 percent partial disability rating was

"not inconsistent with the finding that the claimant is unable to perform very heavy, heavy, and medium work activity, but retains the physical capacity to perform a range of light work."  (*Id.*) Whether or not this specific rating accounted for all of Plaintiff's impairments is inconsequential because the ALJ formulated her findings based on all of the evidence (not just this opinion) and her own explanation indicates that she did not heavily rely on this Worker's Compensation disability percentage, but instead found that it was not inconsistent with her findings based on the other evidence.  Consequently, the ALJ's partial reliance on this opinion was not error and does not undermine the validity of the RFC assessment.

### b.  Dr. Finger and Nurse Practitioner Jacobson

The ALJ afforded "some weight" to the earlier opinions from Dr. Finger and Nurse Practitioner Jacobson that ranged from 2005 to 2010.  (T. 37-38.)  The ALJ noted that these opinions showed somewhat greater limitations than she adopted, which explains why she did not afford them greater weight.  (T. 38.)  The ALJ found that Dr. Finger's treatment notes from that time period did not show greater physical limitations.  (*Id.*)  Dr. Finger provided a number of functional opinions prior to the amended alleged onset date of July 14, 2010.  On September 29, 2005, Dr. Finger released Plaintiff to work with standing for no longer than two hours at one time, the need to frequently reposition, lifting 20 pounds, and pushing and pulling 50 pounds. (T. 706.)  She reiterated a need to change positions at will with no prolonged sitting or standing and no lifting greater than 20 pounds in October and December 2010; in December 2010, Dr. Finger also indicated that he was able to stand for four hours at one time now rather than two hours.  (T. 708, 710.)  On January 24, 2006, Dr. Finger released him to work in a "fully duty capacity" due to his ability to perform his activities of daily living with the assistance of his pain medications.  (T. 712.)  Dr. Finger reiterated limitations including the need to change positions at

will with no prolonged sitting or standing and the ability to lift approximately 20 pounds in October and December 2007.  (T. 727-28.)  On April 28, 2008, Dr. Finger opined Plaintiff needed to change positions at will with no prolonged sitting or standing, lifting no greater than 25 pounds, and infrequent bending or squatting.  (T. 732.)  On June 30, 2008, Dr. Finger advised him against repetitive bending or lifting, lifting no more than 25 pounds, and reiterated the need to change positions at will.  (T. 734.)  On October 30, 2008, Dr. Finger noted the need to change positions at will and restricted him to lifting no greater than 25 pounds with infrequent bending at the waist.  (T. 739.)  On December 12, 2008, Dr. Finger opined he should avoid prolonged sitting or standing and lifting greater than 25 pounds.  (T. 740.)  On February 29, 2009, Dr. Finger opined limited bending at the waist, lifting no more than 25 pounds, no prolonged positions, and the need to change positions at will.  (T. 741.)  On July 12, 2010, which appears to be the last instance of treatment with her office, Dr. Finger noted that Plaintiff had a "moderate partial disability from a back standpoint."  (T. 757.)

Regarding the later opinions from Dr. Finger, the ALJ afforded these little weight because she found them to be inconsistent with the objective medical evidence, including Dr. Finger's own examinations and the objective imaging reports.  (T. 38-39.)  These opinions included a statement on May 22, 2009, that Plaintiff could not perform any lifting in addition to similar limitations Dr. Finger had previously assessed, a statement on June 7, 2010, that Plaintiff would be precluded from employment at that time due to a combination of his back impairment and his "current mental state" (he had been admitted to the hospital for homicidal and suicidal ideation the week previously), and a November 23, 2010, note in which Dr. Finger checked a box indicating Plaintiff was "disabled from 'substantial gainful activity'" though she indicated

that she would not complete a functional capacity questionnaire because it was against her policy.  (T. 744, 754, 816.)

The ALJ provided good reasons supported by substantial evidence for the weight she afforded to the various opinions from Dr. Finger.  *See Reddick v. Comm'r of Soc. Sec.*, No. 5:15-CV-0004, 2014 WL 1096178, at *4-5 (N.D.N.Y. Mar. 19, 2014) (finding that the ALJ did not err in giving less than controlling weight to the physician's opinions because they were inconsistent with the substantial evidence of record).  The ALJ correctly indicated that Dr. Finger's statements that Plaintiff was "disabled" or unable to perform substantial gainful activity, without more, were opinions on issues that were reserved to the Commissioner that were not entitled to special deference.  (T. 39.) *See* 20 C.F.R. § 404.1527(d); *Fuimo v. Colvin*, 948 F.Supp.2d 260, 267 (N.D.N.Y. 2013) ("It was proper to give little weight to [an opinion that plaintiff was "severely disabled and not competitively employable"], which concerned issues reserved to the Commissioner.").  The ALJ's rejection of Dr. Finger's one-time indication that Plaintiff was unable to lift any weight is also supported by the evidence in the record as a whole.  Although Plaintiff continued to experience symptoms including tenderness and decreased range of motion related to his back and neck impairments on occasion, the medical evidence does not substantiate an inability to lift or to perform the reduced range of light work in the RFC.  After ending his treatment with Dr. Finger in July 2010, there is little notable physical treatment, with most physical exams in 2011 through early 2013 showing very little objective physical findings supporting Plaintiff's allegations of limitations.  (T. 788, 790, 792, 795, 797, 801, 803, 1033, 1035, 1037, 1039, 1041, 1044.)  Although Plaintiff argues that the MRI studies of the lumbar and cervical spine revealed dramatic changes showing progressive worsening of his degenerative disc disease, the evidence reveals otherwise.  An MRI of the cervical spine from March 2013

indicated that there had been "no significant interval change" and revealed only mild findings, findings which were hardly different from the cervical spine MRI taken in March 2011. (T. 814, 1027.) Lumbar MRIs from later-2005 showed mild degenerative changes. (T. 686-87.) A subsequent lumbar spine MRI from September 2012 showed degenerative changes and disc bulging that was described as mild. (T. 1008.) Consequently, the ALJ's partial reliance on Dr. Finger's earlier opinions that showed a fairly consistent range of functioning from 2005 through 2010 are supported by the evidence showing that Plaintiff's spinal conditions did not significantly change or worsen throughout the period at issue.

The ALJ was also correct that Dr. Finger's own treatment notes from prior to the amended alleged onset date were indicative that Plaintiff did not have greater limitations than those included in the ALJ's RFC assessment. Dr. Finger did note symptoms variously including tenderness to palpation, limited range of motion, and somewhat stiff gait or positive straight leg raising at times, but also generally noted normal motor tones, strength, reflexes, and sensation. (T. 704, 708, 710, 712, 714, 716, 718, 727-28, 730, 732, 734, 736, 739-42, 744, 747, 749, 751, 753, 756-57.) Although these treatment notes do show a "waxing and waning" pattern in which Plaintiff's symptoms fluctuated in severity at times, as a whole they fail to show limitations greater than those included in either the ALJ's RFC or Dr. Finger's multiple opinions suggesting a capacity to perform light work with the need to change positions and limit his bending at the waist.

The record does contain neurological examinations from 2012 and 2013 in which Plaintiff is sporadically noted to have a degree of decreased sensation in his lower extremities, some balance and gait abnormalities, and use of a cane on one occasion. (T. 595, 1101, 1113, 1122, 1139, 1171.) An MRI of his brain from October 2013 indicated findings suggestive of a

demyelinating disease such as multiple sclerosis, raising the question of whether these more recently-developed neurological symptoms were related to his spinal impairments or a different disorder. (T. 1157.) In any event, even if they were caused by Plaintiff's spinal impairments, there is substantial evidence to support the ALJ's RFC assessment that Plaintiff could perform a reduced range of light work with the ability to alternate between sitting and standing throughout the workday and occasional bending at the waist, a finding which is generally consistent with Dr. Finger's earlier opinions with alterations based on the ALJ's consideration of the evidence as a whole. (T. 29.) The weight the ALJ afforded to Dr. Finger's various opinions is supported by substantial evidence.

### c. Dr. Martin

The ALJ afforded little weight to Dr. Martin's opinion, indicating that it was "not supported by the record." (T. 38.) As the ALJ noted, Dr. Martin opined that Plaintiff could never lift any weight, could sit more than two hours at one time and less than one hour total,[2] could stand 10 minutes at one time, could stand or walk less than two hours total, would need to shift positions at will, take breaks every 30 minutes to walk or stretch and use a cane to stand and walk, and could never climb, balance, kneel, crouch, crawl or stoop, occasionally bend and twist and occasionally use his upper extremities (T. 1163-1168.)

The ALJ's rejection of Dr. Martin's opinion is supported by substantial evidence because, as already detailed above in Part III.C.1.b above, the overall medical evidence, including Dr. Martin's own treatment notes, does not show that Plaintiff's impairments imposed such severely

_____

[2]   Because a second page in the same functional opinion from Dr. Martin also indicates a restriction to sitting for 15 minutes at one time, it is unclear what Dr. Martin actually opined on that particular limitation. (T. 1164.)

restrictive physical limitations as expressed in Dr. Martin's opinion.  Because the ALJ provided a good reason supported by substantial evidence for rejecting Dr. Martin's opinion, she committed no error in doing so.  *Greek*, 802 F.3d at 375; *Reddick*, 2014 WL 1096178, at *4-5.

### 2.  Mental RFC and Opinions

The ALJ afforded little weight to the opinions from Nurse Practitioner Behling, little weight to the mental portions of opinions from Dr. Finger and Dr. Martin, little weight to the opinions from Ms. Warren and Ms. Venditti related to the traumatic brain injury waiver program, little weight to the opinion from consultative examiner Dr. Shapiro, and some weight to State Agency psychological consultant Dr. Altmansberger.  (T. 41-42, 44-46.)  These opinions will be discussed in turn below.

### a.  Nurse Practitioner Behling

The ALJ afforded little weight to the multiple opinions from treating Nurse Practitioner Behling, finding that these opinions appeared to be primarily based on Plaintiff's subjective complaints because they were not supported by the mental health treatment evidence, including Nurse Practitioner Behling's own examinations.  (T. 44.)  Nurse Practitioner Behling submitted two functional opinions regarding Plaintiff's mental functioning, on February 2, 2012, and November 26, 2013, both of which contained limitations which indicated Plaintiff would be unable to perform the mental demands required of even basic unskilled work.  (T. 817-23, 1148-53.)  However, this Court agrees with the ALJ that such an extensive degree of mental limitation is not supported by the evidence in the record as a whole.  Much of the mental health evidence (which has been discussed above in Part III.B of this Decision and Order) shows that, while Plaintiff experienced some degree of limitation, there was nothing to substantiate greater limitations than those accommodated for in the RFC.  Nurse Behling's treatment notes in

particular do not support her extensive limitations, because they show that, although Plaintiff continued to report occasional suicidal thoughts without plan or intent, some irritability, and some ongoing mood and affect abnormalities, he was consistently noted to have fair or good attention and concentration, fair to good eye contact, and generally normal speech and thought process. (T. 805-06, 809, 998, 1000, 1002, 1004, 1006, 1055-56, 1058, 1060, 1062, 1064, 1066, 1068, 1070, 1072, 1074, 1076, 1078, 1081, 1083, 1176, 1178.) In addition, Nurse Practitioner Behling specifically noted that Plaintiff's symptoms had visibly improved with medication, even when Plaintiff reported they were not helping. (T. 806, 1000, 1002, 1047.) Notably, on December 3, 2013 (about a week after Nurse Practitioner Behling wrote one of her opinions), Nurse Practitioner Behling observed he had good concentration and focus, normal thought process and speech, fair insight and judgment, a slightly tense affect, and a slight frustrated and anxious mood. (T. 1176.) This treatment note is generally representative of the findings Nurse Practitioner Behling made throughout her treatment relationship with Plaintiff and does not provide support for the disabling limitations she included in her opinions. The ALJ's rejection of Nurse Behling's opinions due to a lack of support from the mental health treatment evidence is supported by substantial evidence.

### b. Dr. Finger and Dr. Martin

The ALJ afforded little weight to portions of the opinions of Dr. Finger and Dr. Martin that related to Plaintiff's mental functioning, such as Dr. Finger's June 2010 opinion that Plaintiff was precluded from performing work at that time due to the combination of his back pain and his current mental state, and Dr. Martin's notations that Plaintiff would constantly experience symptoms severe enough to interfere with his attention and concentration and would have a moderate limitation in dealing with work stress. (T. 44-45, 754, 1145, 1168.) As noted

previously in relation to Dr. Finger's physical opinions, the ALJ need not afford any special deference to an opinion that Plaintiff is disabled because that is an issue reserved to the Commissioner. *Fuimo*, 948 F.Supp.2d at 267. As the ALJ notes, Dr. Finger rendered her opinion not long after Plaintiff's hospital admission for an acute exacerbation of his mental impairment, and Dr. Finger only ever assessed Plaintiff's mental state personally on the examination when she made this statement that Plaintiff was unable to work; she did not have the opportunity to revise that opinion after Plaintiff was in treatment for his mental impairments. (T. 45.) Additionally, regarding both Dr. Finger's and Dr. Martin's opinion, neither the mental health evidence nor the sources' own treatment records support their assessment of the impact of Plaintiff's mental limitations. Because the ALJ explicitly indicated he was rejecting Dr. Martin's opinion based on the few positive clinical findings noted on Dr. Martin's examinations, the ALJ has provided reasons supported by substantial evidence for declining to rely on either of these opinions. *See Greek*, 802 F.3d at 375; *Reddick*, 2014 WL 1096178, at *4-5.

### c. Ms. Warren and Ms. Venditti

The ALJ afforded little weight to the opinions from Ms. Warren and Ms. Venditti, both of whom assessed Plaintiff in relation to his participation in the traumatic brain injury waiver program. (T. 45.) The ALJ found that Ms. Warren's assertion that Plaintiff had "poor" rehabilitation potential and degree of improvement due to his traumatic brain injury was inconsistent with a previous statement she had made indicating that Plaintiff had no significant impairment in behavior or basic activities of daily living. (*Id*.) Ms. Venditti opined that Plaintiff required significant supports in order to stay out of a nursing facility, would benefit from frequent reminders and clear step-by-step instructions, and was impulsive when triggered, difficult to re-direct, escalated quickly, and internalized his feelings for days at a time. (T. 1146-

47.)  The ALJ found that Ms. Venditti's opinion lacked support from the record, which she indicated showed involvement in a range of daily activities that used social, attention, memory, and concentration skills, as well as that the assessment appeared to rely primarily on Plaintiff's subjective report rather than objective evidence.  (T. 45.)  The ALJ's notation of inconsistencies in Ms. Warren's statements and of a lack of support from the medical evidence for the severe limitations Ms. Venditti opined are supported by substantial evidence based on the previous discussion of the mental health treatment evidence that showed moderate limitations at most, in particular the evidence related to Plaintiff's generally good attention and concentration on examinations and the cognitive and neuropsychological testing.  The ALJ therefore provided adequate reasons for declining to accept the limitations suggested by their opinions.  *See* SSR 06-03p, 2006 WL 2329939.

### d.  Dr. Shapiro

The ALJ afforded little weight to the opinion from CE Dr. Shapiro, indicating that this opinion was based on a single examination and appeared to be based primarily on Plaintiff's subjective reports when compared with the "few positive clinical findings" that were noted on Dr. Shapiro's examination.  (T. 45-46.)  Dr. Shapiro opined that Plaintiff would have difficulty adequately understanding and following some instructions and directions as well as completing tasks due to memory and concentration deficits, difficulty interacting appropriately with others due to social withdrawal, difficulty attending work and maintaining a schedule due to lack of motivation and lethargy, and an inability to appropriately manage stress.  (T. 761.)  However, on examination, Dr. Shapiro observed that Plaintiff was cooperative with adequate social skills and presentation, appropriately dressed with good hygiene and grooming, had normal motor behavior, normal speech, a normal thought process, and a depressed mood, appeared sad with a

27

constricted and somewhat reduced affect, and had intact attention and concentration, intact recent and remote memory, estimated deficient intellectual functioning, limited general fund of information, and poor judgement and insight. (T. 760.) As the ALJ noted, these mostly normal examination observations do not appear to support her opinion. For example, there is a clear internal inconsistency between Dr. Shapiro's notation that Plaintiff had intact attention, concentration, and recent and remote memory when tested on the exam, and her opinion that Plaintiff would have difficulty performing tasks due to memory and concentration deficits. (T. 760-61.) Given the lack of support from Dr. Shapiro's own opinion, the ALJ had sufficient reason supported by substantial evidence to decline to rely on Dr. Shapiro's opinion. 20 C.F.R. § 404.1527(c)(3) (indicating that the degree to which the source provides evidence and explanation to support her opinion is one of the factors to be considered when weighing opinion evidence).

### e. Dr. Altmansberger

Regarding the opinion of State Agency psychological consultant Dr. Altmansberger, Plaintiff asserts that "the ALJ did not state what significant mental capabilities the consultant found," further asserting that "[a]ll of the functional opinions of the consultant were phrased in the negative." (Dkt. No. 28, at 29 [Pl. Mem. of Law].) Plaintiff argues that the perceived nature of Dr. Altmanberger's opinion and the ALJ's failure to state what capabilities Dr. Altmansberger found resulted in the ALJ substituting her own opinion for Dr. Altmansberger's opinion. (*Id.*) These assertions are unpersuasive and not consistent with either the ALJ's written decision or Dr. Altmansberger's opinion. In his opinion, Dr. Altmansberger opined Plaintiff was moderately limited in the following mental abilities: understanding, remembering, and carrying out detailed instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; completing a normal workday or workweek without

interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others.  (T. 776-77.)  Dr. Altmansberger concluded that Plaintiff remained capable of "simple work in a position with limited contact with people."  (T. 778.)

In her decision, the ALJ specifically indicated that Dr. Altmansberger had opined this ability to perform simple work with limited contact with people and afforded that opinion "some weight," finding that it was generally supported by the objective medical evidence including the evidence received after Dr. Altmansberger's review.  (T. 41-42.)  The ALJ essentially limited Plaintiff to simple work with limited interaction with others (including interaction to the extent required to carry out simple tasks only with no management or supervision of others and rare contact with the general public) and simple, repetitive work-related stress.  (T. 29.)  Although the ALJ's RFC deviated somewhat from Dr. Altmansberger's opinion based on her consideration of all the evidence, it is clear that, contrary to Plaintiff's arguments, the ALJ did not substitute her own opinion for Dr. Altmansberger.  *See Quinn v. Colvin*, 199 F.Supp.3d 692, 712 (W.D.N.Y. 2016) (noting that, "'while an ALJ cannot arbitrarily substitute his own judgment for a competent medical opinion,' [] 'the ALJ's RFC finding need not track any one medical opinion'") (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *O'Neil v. Colvin*, No. 13-CV-0575, 2014 WL 5500662, at *6 (W.D.N.Y. Oct. 30, 2014)); *Kitka v. Comm'r of Soc. Sec.*, No. 5:15-CV-0060, 2016 WL 825259, at *9 (N.D.N.Y. Feb. 9, 2016) ("There is no requirement that the ALJ accept every limitation in the opinion of a consultative examiner.") (citing *Pellam v. Astrue*, 508 F.App'x 87, 89 (2d Cir. 2013)).  Although it has been recognized that the opinion of

a non-examining physician, standing alone, does not constitute substantial evidence to support the ALJ's findings, the ALJ very clearly relied on more than just Dr. Altmansberger's opinion in this case, as can be seen from her detailed discussion showing thorough consideration of the mental health treatment evidence.  (T. 41-46.)  *See also Henry v. Astrue*, 32 F.Supp.3d 170, 187-88 (N.D.N.Y. 2012) (finding that the ALJ's consideration of the treatment evidence, along with the State Agency medical consultant's opinion, amounted to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  As in *Henry*, the ALJ's consideration of the treatment evidence in addition to Dr. Altmansberger's opinion show that her mental RFC findings are supported by substantial evidence.

For all these reasons, the weight the ALJ afforded to the various opinions in the record and the RFC determination were supported by substantial evidence, and remand is not required on this basis.

### D.     Whether the Credibility Determination Was Supported by Substantial Evidence

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 32, at 17-19 [Def.'s Mem. of Law].)  To those reasons, the Court adds the following analysis.

 In determining whether a claimant is disabled, the ALJ must also make a determination as to the credibility of the claimant's allegations.  "'An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Schlichting v. Astrue*, 11 F.Supp.3d 190, 205 (N.D.N.Y. 2012)

(quoting *Lewis v. Apfel*, 62 F.Supp.2d 648, 651 (N.D.N.Y. 1999)). The Second Circuit

recognizes that "'[i]t is the function of the [Commissioner], not [reviewing courts], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant,'" and

that "[i]f there is substantial evidence in the record to support the Commissioner's findings, 'the

court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.'"

*Schlichting*, 11 F.Supp.3d at 206 (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d

638, 642 (2d Cir. 1983); *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591

(2d Cir. 1984)). Due to the fact that the ALJ has the benefit of directly observing a claimant's

demeanor and "other indicia of credibility," the ALJ's credibility assessment is generally entitled

to deference. *Weather v. Astrue*, 32 F.Supp.3d 363, 381 (N.D.N.Y. 2012) (citing *Tejada v. Apfel*,

167 F.3d 770, 776 (2d Cir. 1999)).

Plaintiff outlines a number of objections to the ALJ's credibility determination. (Dkt.

No. 28, at 34-39 [Pl. Mem. of Law].) However, this Court agrees with Defendant that the ALJ

provided sufficient clear reasons to show that her credibility determination was supported by

substantial evidence. (Dkt. No. 32, at 17-19 [Def. Mem. of Law].) The ALJ's decision is filled

with statements regarding the reasons for her finding that Plaintiff's allegations were not fully

credible, including a four-page section exclusively devoted to the issue of credibility. (T. 32-36.)

In particular, this Court highlights the ALJ's citation to treatment records which show that

Plaintiff's mental impairments were somewhat improved and stable while taking medications,

that he did not require any further hospitalization once he began mental health treatment, that he

did not report any side effects of the medications he was maintained on for either pain or mental

health purposes, that there were conflicting reports made to different sources regarding

Plaintiff's ability to perform activities of daily living (some of which showed he was far more

functional and independent than he alleged particularly at the hearing), and that he stopped working due to a lay-off related to a lack of work rather than his impairments.  (T. 33-35.)  These reasons, which are clearly laid out in the ALJ's decision and consistent with the evidence, are sufficient to show that the ALJ's credibility finding is supported by substantial evidence.

For all these reasons, the ALJ's credibility finding was supported by substantial evidence and remand is not required on this basis.

### E.     Whether the ALJ Erred in Failing to Further Develop the Record

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendant's memorandum of law.  (Dkt. No. 32, at 19-20 [Def.'s Mem. of Law].)  To those reasons, the Court adds the following analysis.

The Second Circuit has noted that, "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'"  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009)).  "'It is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits.'"  *Moran*, 569 F.3d at 112-13 (quoting *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004)).  This Court has recognized that "[i]n furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to permit a reasoned disability determination and additional information is needed to resolve the question."  *Crysler v. Astrue*, 563 F.Supp.2d 418, 432 (N.D.N.Y. 2008) (citing 20 C.F.R. § 404.1512(e)).

As Defendant points out, Plaintiff does not indicate what sources the ALJ erred in failing to re-contact or what information Plaintiff believes needed to be obtained in order to create a complete record.  (Dkt. No. 28, at 39-40 [Pl. Mem. of Law]; Dkt. No. 32, at 19-20 [Def. Mem. of Law].)  To the extent that Plaintiff asserts that the ALJ needed to re-contact the treating sources to determine what they based their opinions on, such an argument is not availing.  There were ample treatment records from Dr. Finger, Nurse Practitioner Behling, and Dr. Martin in particular from which the ALJ was able to determine whether those opinions were supported by the treatment each of those sources provided.  The evidence in this case was more than adequate to allow the ALJ to make a reasoned determination of Plaintiff's disability status and there is no indication that further evidence was needed to resolve any outstanding questions or inconsistencies.

For all these reasons, there is no basis for requiring further development of the record and remand is not required for such purposes.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for judgment on the pleadings (Dkt. No. 28) is **<u>DENIED</u>**; and it is further

**ORDERED** that Defendant's motion for judgment on the pleadings (Dkt. No. 32) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Defendant's decision denying Plaintiff disability benefits is **<u>AFFIRMED</u>**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **<u>DISMISSED</u>**.

Dated: May 26, 2017
      Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge